UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MARYANN BROWN,

**COMPLAINT**

             Plaintiff,

Docket No.:

   -against-

Jury Trial Demanded

590-600 REALTY CORP., and KARAN SINGH, individually,

             Defendants.
-----------------------------------------------------------------X

      MARYANN BROWN ("Plaintiff"), by and through her attorneys, BORRELLI & ASSOCIATES, P.L.L.C., as and for her Complaint against 590-600 REALTY CORP. ("590-600"), and KARAN SINGH ("Singh"), individually, (collectively as "Defendants"), alleges upon knowledge as to herself and her own actions and upon information and belief as to all other matters as follows:

## NATURE OF THE CASE

      1.    This is a civil action based upon willful violations that the Defendants committed of Plaintiff's rights guaranteed to her by: (i) the anti-retaliation provisions of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3613, 3617; (ii) the anti-retaliation provisions of the New York State Human Rights Law, Executive Law Sections 290, *et seq.* ("NYSHRL"); (iii) the anti-retaliation provisions of the New York Labor Law ("NYLL"), NYLL § 215; and (iv) any other claim(s) that can be inferred from the facts set forth herein.

      2.    Plaintiff worked for Defendants - - a corporation that owns and manages residential apartment buildings, and its day-to-day overseer - - from in or around October 2010 to November 17, 2012 as a receptionist, and from on or around November 18, 2012 to January 23,

2016 as an Office Manager.  She is a current resident in an apartment in Defendants' building located at 600 Fulton Avenue, Hempstead, New York 11550 (hereinafter "the Building").

3.     Throughout her employment as both Defendants' "Receptionist" and "Office Manager," Defendants paid Plaintiff a flat weekly salary of $500.00, and thus at a weekly rate of pay below that to qualify her for an overtime exemption under the NYLL, while also requiring Plaintiff to work over forty hours per week without paying her any overtime compensation. Moreover, as part of her regular job duties beginning after November 18, 2012 and for the same pay, Defendants required Plaintiff to be available to respond to various issues arising in Defendants' Building twenty-four hours per day, six-to-seven days per week.  At the same time, also beginning after November 18, 2012, Defendants required Plaintiff to live in the Building to carry out these job duties, while charging Plaintiff rent to live in the Building ranging from $950.00 per month to $1,200.00 per month, which amounted to unlawful deductions from her pay.  Each of these wage violations is being addressed in a separate lawsuit filed in the Supreme Court, State of New York, County of Nassau, Index Number 601605/2017.

4.     Beginning in 2013, Plaintiff began regularly complaining about not being paid a fair wage despite her extraordinarily onerous work schedule.  At the same time in early 2013, Defendants forced Plaintiff to subject African-American tenant-applicants to a significantly more onerous application process than Hispanic tenants-applicants, the latter of whom would be granted apartment rentals with no application or background check.

5.     Plaintiff regularly objected to Defendants' housing practices after she learned about them, and beginning in 2015 she flatly refused to rent any apartments on Defendants' behalf under such an unlawful policy.

2

6.    Immediately thereafter and continuing throughout the remainder of her employment, Defendant Singh retaliated by verbally harassing Plaintiff such as by screaming and cursing at her virtually any time Plaintiff approached Singh about a work-related task.  This continued for over a year.

7.    On January 23, 2016, after Plaintiff demanded that the harassment stop and demanded to be paid fairly, and also continued to outwardly refuse to rent apartments under such illegal policies, Defendant Singh again berated Plaintiff - - this time within earshot of one of Defendants' tenants, causing Plaintiff extreme embarrassment and humiliation.  In response, Plaintiff gave Defendants an ultimatum: either stop verbally harassing her and breaking the law and start paying her a fair wage, or else Plaintiff would cease her employment.  Defendants refused, and Plaintiff's employment concluded by way of a constructive discharge that day.

8.    Thereafter, realizing that Defendants could no longer take advantage of Plaintiff's grueling labor, while also realizing that Plaintiff posed a threat to Defendants' unabated housing discrimination, Defendants vigorously increased their retaliation by: filing now more than five separate eviction proceedings; unlawfully increasing Plaintiff's rent; and spreading dangerous lies about Plaintiff to the Building's tenants, claiming that Plaintiff was a "crackhead" who had stolen tenants' rental payments.

9.    Defendants' actions are in blatant violation of the anti-retaliation provisions of the FHA, NYSHRL, and NYLL.

## JURISDICTION AND VENUE

10.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under 42 U.S.C. §§ 3613 and 3617.  The supplemental jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1367 over all state law claims.

11.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims for relief occurred in this judicial district.

## PARTIES

12.     At all relevant times herein, Plaintiff worked for Defendants in New York and was and is a "person" entitled to protection as defined by the FHA, NYSHRL, and NYLL.

13.     At all relevant times herein, Defendant 590-600 was and is a New York corporation with its principal executive office located at 600 Fulton Avenue, Hempstead, New York, 11550.

14.     At all relevant times herein, Defendant Singh was and is the landlord, managing agent, and principal executive of 590-600, who in that capacity served as the day-to-day supervisor of all of Defendants' employees, including Plaintiff, and offered rentals of dwellings in connection with residential real estate transactions under the FHA and NYSHRL.

15.     At all relevant times herein, Defendants were and are "employers" within the meaning of the NYLL.

## BACKGROUND FACTS

16.     Defendant 590-600 owns and/or operates residential apartment buildings.

17.     Defendant Singh was and is the landlord and owner of the Building where Plaintiff worked and continues to reside, and personally manages and oversees the day-to-day operations of Defendants for all matters with respect to hiring, firing, disciplining, and determining employees' rates and methods of pay and hours worked.  To that end, Defendant Singh personally hired Plaintiff, and controlled and enforced Defendants' discriminatory housing policies.

4

18.     Defendant Singh also personally reviewed and approved all tenant applications before any new resident was authorized to move into the building.

19.     Defendants first employed Plaintiff as a receptionist in October of 2010. Plaintiff's duties then included, but were not limited to, collecting rent, showing apartments to prospective tenants, preparing paperwork pursuant to maintenance work orders, fielding phone calls, communicating with federal, state, and/or local representatives under the Section 8 housing program, and ordering office supplies on behalf of Defendants.

20.     On or around November 18, 2012, Defendants changed Plaintiff's job title to "Office Manager," and required her to live in the Building at her own expense.  As a result, Defendants drastically altered Plaintiff's job duties, requiring her to respond to any and all Building-related issues that arose at all hours of the day and night, six or seven days per week.

21.     At all times while living in the Building, Defendants charged Plaintiff rent.

22.     During her first five months of living in the Building, this amount was $1,200.00 for a one-bedroom apartment.

23.     For all subsequent months of her employment, that amount ranged from $950.00 per month to $990.00 per month for a studio apartment.

24.     On a near-weekly basis following the change in Plaintiff's job duties and continuing throughout the end of her employment, Plaintiff regularly complained to Defendant Singh about not receiving fair wages for her extraordinarily onerous work schedule.

25.     To date, Plaintiff continues to live in the same studio apartment she began occupying after her first five months working as an "Office Manager."

26.     Beginning in or around April of 2013, Plaintiff began to notice that Defendants' new tenant demographic shifted from what had been predominantly African-American tenants to an increasing number of Hispanic-only new tenants.

27.     Plaintiff's observations were confirmed when, in or around June of 2013, Defendants, through Defendant Singh, instructed Plaintiff to enforce a *per se* discriminatory housing policy, whereby African-American applicants would be subject to an arduous application process, only to have their applications placed on a so-called "waiting list," ultimately to  be denied in virtually all instances.  This policy included subjecting prospective African-American tenants to an extensive application, background check, credit check, and charging application fees, routinely resulting in a protracted delay at best, and consistent denials at worst.

28.     In contrast, Hispanic and other non-African American applicants simply needed to produce two months' rent in cash and a passport, and Defendants would then immediately rent apartments to them.

29.     For example, in or around December of 2013, after Plaintiff confirmed that a prospective African-American tenant successfully passed a background check and had sufficient credit, Plaintiff accepted rent and a security deposit on Defendants' behalf, and informed the new African-American tenant that he could soon move into the Building.  But Defendant Singh - - citing the discriminatory policy - - overrode Plaintiff's decision, rejected the application, and stated that he instead planned to lease the apartment to an Hispanic applicant who had not undergone the same grueling application process.

30.     During this period, Plaintiff also learned that Defendants attempted to stop renting apartments to recipients of public assistance, such as Section 8 tenants, as Defendants required tenants to pay rent over and beyond their legal maximum capacity to do so under Section 8.

31.     On a near-weekly basis after she understood the breadth of Defendants' discriminatory policies, Plaintiff objected to Defendants' unlawful housing discrimination by, among other ways, refusing to process applications for applicants who had not submitted a formal application, and by outright declaring to either Defendant Singh or Defendants' Building Superintendent Melvin Acosta that their rental practices were illegal, and that Plaintiff would neither enforce nor participate in them.

32.     Beginning in early 2015, Plaintiff flatly refused to continue to rent apartments for Defendants due to Defendants' discriminatory housing policies.   Beginning immediately thereafter, Defendant Singh began verbally abusing Plaintiff on a near-constant basis, routinely cursing and screaming at her virtually any time Plaintiff addressed any work-related task with Singh.

33.     Growing weary of Singh's verbal abuse, realizing that her complaints were falling on deaf ears, and believing that Defendants' African American tenant population had been shrinking while the Hispanic tenant population had drastically increased, Plaintiff began scrupulously inspecting Defendants' tenant registry.   During November of 2015, Plaintiff discovered that between the dates of October 3, 2013 and October 9, 2015, the combined population at Defendants' buildings at 590 and 600 Fulton Avenue, Hempstead, New York increased its Hispanic population by more than 17%, in contrast to a comparable decrease in both buildings' African-American tenant populations.

34.     On or around December 28, 2015, Defendants again directed Plaintiff to place an Hispanic applicant into an apartment without any vetting or application process.  Plaintiff again requested that Defendants require the individual to fill out an application, citing Defendants' discriminatory policy.  In response, Defendant Singh - - in his usual manner - - cursed at Plaintiff, telling her to "mind her fucking business and do her job." He then allowed the applicant to move into the building consistent with Defendants' discriminatory policy.

35.     Shortly thereafter, on January 23, 2016, while Plaintiff attended to the needs of a tenant in Defendants' office, Singh began verbally abusing Plaintiff, calling her a "fucking crackhead" and screaming that she was "fucking stupid" within the tenant's earshot.  This caused Plaintiff extreme embarrassment and humiliation.  In response, immediately after Plaintiff received her paycheck later that day, Plaintiff handed Singh a letter stating, among other things, that she would only continue working if Defendants stopped "cursing at her" (in front of tenants or otherwise), and if Defendants agreed to compensate her "fairly" after working "more than 45 hours a week."

36.     Defendant Singh refused to acquiesce to Plaintiff's request to be paid properly and to work without verbal abuse.  Thus, Plaintiff - - after objecting to Defendants' requirement that she work obscene hours without any pay, objecting to Defendants' verbal abuse, and objecting to Defendants' discriminatory housing policies - - departed her employment by way of constructive discharge that very day.

37.     But terminating her employment only served to open the floodgates of Defendants' fury, as Defendants were now unleashed to further retaliate against Plaintiff following her objections to Defendants' flagrant housing discrimination and wage violations.

38.     That is, immediately after Plaintiff stopped working for Defendants following her constructive discharge, Defendants began an onslaught of unlawful retaliation designed to ruin Plaintiff's life - - emotionally, financially, and potentially through physical violence.

39.     First, on February 4, 2016, Defendants served Plaintiff, who remained a tenant in Defendants' building, with a fraudulent petition for eviction, pursuant to the jurisdiction of the non-existent "Civil Court of the City of New York, County of Nassau, Housing Part," based on Plaintiff's rental arrears.

40.     Second, immediately following Plaintiff's constructive discharge, Defendants unlawfully increased Plaintiff's rent from $990.00 per month to $1,321.93 per month.

41.     Thereafter, Defendants filed an actual petition for eviction in Nassau County Civil Court, falsely claiming that Plaintiff's rent was $1,321.41 per month for at least the previous five months, and despite knowing that as early as August 11, 2016, Plaintiff had sought (and was in the process of obtaining) an Emergency Solutions Grant from the Nassau County Office of Housing and Community Development which would cover all past-due rent.  Upon receipt of the housing assistance Grant within two weeks of Defendant's filing, the eviction proceeding was resolved, with all rental arrears paid.

42.     But this did not stop Defendants.  Instead, Defendants proceeded to file *at least four other eviction proceedings* - - all of which were ultimately resolved either by stipulation or were withdrawn as baselessly without merit.

43.     Upon withdrawal of the most recent eviction proceeding in November of 2016, Defendants further retaliated against Plaintiff by again attempting to increase her rent for the second time in less than one year, to $1,344.62 per month.

44.     As recently as February 1, 2017, Defendants have also accused Plaintiff of "stealing" other tenants' rents, falsely referring to her as "crackhead" and instructing tenants to approach her about any allegedly missing rental payments.

45.     Plaintiff attempted to put a stop to Defendants' rental abuses by filing a harassment complaint with the New York State Division of Housing and Community Renewal ("DHCR") on December 22, 2016.  After Defendants filed their Answer to Plaintiff's DHCR complaint on January 30, 2017, Defendants *again* retaliated against Plaintiff on February 21, 2017 by serving Plaintiff with an order to vacate her apartment within fifteen days or else she would face yet another eviction proceeding.

46.     And after Defendants filed their DHCR answer, on February 21, 2017, Defendants, through Singh, served Plaintiff with a Fifteen Day Notice to terminate her occupancy of her apartment, stating that if she did not vacate the premises by March 16, 2017, Defendants would "commence summary proceedings . . . to remove [her] from the premises . . . ." Defendants served this notice despite previously stating to Plaintiff - - in writing - - that her lease would not expire until April 14, 2017, as yet another example of Defendants' unrelenting retaliation.

### FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS
*Retaliation under the FHA*

47.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

48.     FHA § 3617 prohibits retaliation in any manner against any person who aids or encourages any other person in the exercise of any rights protected by the FHA.

49.     FHA § 3604 prohibits persons offering the rental of dwellings from discriminating against individuals seeking to obtain housing on account of, *inter alia*, race or color.

50.     As described above, Defendants have offered and continue to offer the rental of dwellings as defined by the FHA.

51.     As described above, after Plaintiff engaged in activity protected by the statute, Defendants retaliated as also described above.

52.     As a direct and proximate result of the Defendants' unlawful retaliatory conduct in violation of the FHA, Plaintiff has suffered, and continues to suffer, economic harm for which she is entitled to an award of monetary damages and other relief.

53.     As a direct and proximate result of these Defendants' unlawful retaliatory conduct in violation of the FHA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, fear of physical violence, and emotional pain and suffering, for which she is entitled to an award of monetary damages, reasonable attorneys' fees, costs, punitive damages, and other relief.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS
### *Retaliation in Violation of the NYSHRL*

54.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

55.     NYSHRL § 296(2-a) prohibits any owner, lessee, sub-lessee, assignee, or managing agent of publicly-assisted housing accommodations or other person having the right of ownership or possession of or the right to rent or lease such accommodations from discriminating against any person or group of persons by refusing to sell, rent or lease or

otherwise to deny to or withhold from such housing accommodations because of the race, creed, color, disability, national origin, sexual orientation, military status, age, sex, marital status, or familial status of such person or persons.

56.     NYSHRL § 296(7) prohibits retaliation or discrimination against any person because he or she has opposed any practices made unlawful under this section.

57.     As described above, Plaintiff is a person within the meaning of the NYSHRL, while the Defendants are persons within the meaning of the NYSHRL.

58.     As also described above, after Plaintiff opposed Defendants' discriminatory housing practices, forbidden by the NYSHRL, Defendants retaliated against Plaintiff as detailed above.

59.     As a direct and proximate result of the Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and will continue to suffer, economic harm for which she is entitled to an award of monetary damages and other relief.

60.     As a direct and proximate result of the Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and will continue to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
*Retaliation in violation of the NYLL*

61.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

62.     N.Y. Lab. Law § 215 prohibits employers from discharging or in any other manner discriminating against an employee because such employee has filed any complaint relating to an employer's violation of the NYLL.

63.     As described above, Defendants are employers within the meaning of the NYLL while Plaintiff is an employee within the meaning of the NYLL.

64.     As also described above, after Plaintiff lodged a complaint with Defendants asserting that Defendants violated the NYLL, Defendants retaliated against Plaintiff as described herein.

65.     At or before the filing of this Complaint, Plaintiff has served notice of this action upon the Office of the New York State Attorney General.

66.     As a direct and proximate result of the Defendants' unlawful retaliatory conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, economic harm for which she is entitled to an award of monetary damages and other relief.

67.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, fear of physical violence, and emotional pain and suffering, for which she is entitled to an award of monetary damages, reasonable attorneys' fees, costs, punitive damages, and other relief.

## **DEMAND FOR A JURY TRIAL**

68.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury in this action.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      A judgment declaring that the practices complained of herein are unlawful and in willful violation of the aforementioned United States and New York State laws;

B.      Preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

C.      An order restraining Defendants from any further retaliation against Plaintiff for participation in any form in this litigation;

D.      All compensatory damages that Plaintiff has sustained due to Defendants' retaliatory conduct, including emotional distress damages and any financial out-of-pocket losses that Plaintiff might incur or might have incurred as a result of such conduct, including back pay, front pay, and loss of any other benefits of employment, whether legal or equitable;

E.      Granting an award of damages to be determined at trial to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment in connection with her FHA, NYSHRL, and NYLL claims;

F.      Liquidated damages and any other statutory penalties as recoverable under the FLSA and the NYLL;

G.      Punitive damages, as provided by law;

H.      Awarding Plaintiff her costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs;

I.      Pre-judgment and post-judgment interest, as provided by law; and

J.       Granting Plaintiff other and further relief as this Court finds necessary and proper.

Dated:  New York, New York
        February 28, 2017

                                        Respectfully submitted,

                                        BORRELLI & ASSOCIATES, P.L.L.C.
                                        *Attorneys for Plaintiff*
                                        655 Third Avenue, Suite 1821
                                        New York, New York 10017
                                        Tel.:    (212) 679 – 5000
                                        Fax.:    (212) 679 – 5005

                    By:     _____
                                        MICHAEL R. MINKOFF (MM 4787)
                                        ALEXANDER T. COLEMAN (AC 8151)
                                        MICHAEL J. BORRELLI (MB 8533)